

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00255-CV

IN THE INTEREST OF A.S.D.,
A CHILD

----------

FROM THE 393RD DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant V.Z. appeals from the trial court's termination of her parental rights to daughter A.S.D., who sustained life-threatening injuries at the hands of C.N., V.Z.'s boyfriend (Boyfriend). V.Z. contends that the evidence is insufficient to support the trial court's findings under (D), (E), and (O) and the best interest finding; that the trial court abused its discretion by denying her motion to extend the one-year dismissal deadline; and that she was deprived of due process, due course of law, and equal protection. Because we hold that the evidence is

---

[1]*See* Tex. R. App. P. 47.4.

sufficient to support the endangerment findings, that the trial court did not abuse its discretion by refusing to extend the dismissal deadline, and that V.Z. forfeited her constitutional issues by failing to preserve them below, we affirm the trial court's judgment.

## I. Sufficient Evidence to Support Termination

In her first two issues, V.Z. appears to contend that the evidence is legally and factually insufficient to support the trial court's endangerment and best interest findings.[2] We note that V.Z. did not raise legal sufficiency of the evidence to support the best interest finding in her statement of points. Under former section 263.405(i), which controls this case,[3] V.Z. has waived any legal sufficiency issue regarding the best interest finding.[4] While V.Z. did not distinctly raise legal sufficiency of the evidence to support the endangerment findings in her statement of points, however, we liberally construe her "[n]o evidence" subpoints to her factual sufficiency endangerment issues in the statement of points as raising legal sufficiency issues on endangerment. We therefore

---

[2]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (West Supp. 2011).

[3]Act effective Sept. 1, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332, 332 (adding subsection (i), requiring statement of points, to section 263.405 of the family code), *repealed by* Act effective Sept. 1, 2011, 82nd Leg., R.S., ch. 75, §§ 5, 8, 2011 Tex. Gen. Laws 348, 349 (deleting subsection (i) but noting that former section 263.405 is still in effect for final orders rendered before September 1, 2011).

[4]*See id*.; *In re J.H.G.*, 302 S.W.3d 304, 306 (Tex. 2010) (holding mother's failure to raise challenge to trial court's extension of statutory deadline in her statement of points waived issue).

2

address both her legal and factual sufficiency issues regarding the endangerment findings.

## A. Standard of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child.[5]  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.[6]

Termination decisions must be supported by clear and convincing evidence.[7]  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[8]  Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child.[9]

---

[5]Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

[6]*Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).

[7]Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a) (West 2008).

[8]*Id.* § 101.007 (West 2008).

[9]*In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven.[10] We review all the evidence in the light most favorable to the finding and judgment.[11] We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so.[12] We disregard all evidence that a reasonable factfinder could have disbelieved.[13] We consider undisputed evidence even if it is contrary to the finding.[14] That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.[15]

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province.[16] And even

---

[10]*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

[11]*Id.*

[12]*Id.*

[13]*Id.*

[14]*Id.*

[15]*Id.*

[16]*Id.* at 573, 574.

when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.[17]

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own.[18] We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D) and (E) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child.[19] If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.[20]

## B. Treatment of Findings of Fact

Findings of fact are the exclusive province of the factfinder.[21] Findings of fact entered in a case tried to the court have the same force and dignity as a

---

[17]*Id.* at 573.

[18]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

[19]Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[20]*H.R.M.*, 209 S.W.3d at 108.

[21]*Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744–45 (Tex. 1986).

jury's answers to jury questions.[22]  The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer.[23]

But when findings of fact are filed and are unchallenged, they occupy the same position and are entitled to the same weight as the verdict of a jury; they are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding.[24]

## C.  Endangerment

### 1.  The Law

As we have explained in a similar case,

> Endangerment means to expose to loss or injury, to jeopardize.  The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child.  Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being.  Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

---

[22]*Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991).

[23]*Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

[24]*McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Rischon Dev. Corp. v. City of Keller*, 242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied), *cert. denied*, 129 S. Ct. 501 (2008).

. . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth . . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.[25]

Additionally, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct jeopardizing the child's physical or emotional well-being.[26] Finally, even if a parent makes dramatic improvements before trial, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices."[27]

## 2. Application of the Law to the Facts

The record contains the following evidence. When she was young, V.Z. was abused by her father and raped by one of his friends. While she was still in

---

[25]*In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26 2009, no pet.) (mem. op.) (citations omitted).

[26]*In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied).

[27]*In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

7

high school, she met A.S.D.'s father (Father) through a friend. V.Z. became pregnant with A.S.D., moved out of state with Father for a short time, returned to Palestine, Texas, and delivered A.S.D. on October 8, 2007. V.Z. and A.S.D. lived with Father's sister for about six weeks but left after the two women had a dispute. V.Z. then returned to her parents' home with the baby. After two to three months, V.Z. and the baby left V.Z.'s parents' home after V.Z.'s father hit her, and they moved into a Palestine shelter, where they lived until September 2008. At the shelter, V.Z. received assistance with obtaining her legal status. She also began having telephone contact in April 2008 with Boyfriend, a person she had never personally met.

In September 2008, leaving the shelter only because her "time was up," V.Z. returned to her parents' home with A.S.D., where they stayed about two or three months. On December 13, 2008, Boyfriend met V.Z. and A.S.D. in person in Palestine, and V.Z. travelled with A.S.D. and Boyfriend from Palestine to Whitesboro, Cooke County, more than a hundred miles away, to live with him there. V.Z. did not know any details about where she and her fourteen-month-old would be living. She also did not know about Boyfriend's past cocaine use.

V.Z. claimed that she moved to enroll in school and that she had a job opportunity as a waitress but had no one she trusted to look after A.S.D. She "wasn't going to leave [her] baby with [Boyfriend]." At trial, V.Z. conceded that taking A.S.D. to live with someone whom she had just met endangered her well-being. Whereas V.Z. had family, friends, and the shelter in Palestine to turn to

8

for help, she knew no one other than Boyfriend in Whitesboro. Within the first week, Boyfriend called V.Z. "a whore in Spanish" because he had heard that she had been unfaithful. After less than three months in Whitesboro, Boyfriend, V.Z. and A.S.D. moved to a ranch in Aubrey, Texas. In Aubrey, Boyfriend shoved V.Z. once while A.S.D. was present in the home. V.Z. denied that the baby was in the same room. They all stayed in Aubrey about three months and then moved to a horse ranch in Pilot Point. At each location, Boyfriend and V.Z. usually had other roommates, about whom V.Z. appeared to know little.

V.Z. testified that A.S.D. was always with her. She also acknowledged, however, that she let A.S.D. stay with a pregnant friend of Boyfriend's for a week so that the friend could find out what it was like to take care of a child. Finally, Boyfriend also took care of A.S.D. on July 6, 2009, while V.Z. went to court on a shoplifting charge and shopped for groceries.

On July 7 or 8, 2009, A.S.D., who was twenty-one months old, stopped eating and vomited, so V.Z. took her to Denton Presbyterian Hospital. The doctor found bruises on V.Z.'s face and back. At trial, V.Z. did not remember whether she had discussed the origin of the bruises then but stated that she would have done so if the medical personnel had asked. The medical records indicated, however, that she did not explain how the bruises occurred. And she testified that she "really didn't know what had happened to [A.S.D.] with the bruising" despite providing earlier explanations at trial of various falls to account for them.

9

Later that same week, on Saturday, July 11, 2009, Boyfriend interrupted V.Z.'s shower to tell her that something was wrong with A.S.D. V.Z. testified that she had seen A.S.D. a few minutes earlier and that she had been fine. But A.S.D. was now "completely pale and she didn't look right." V.Z. and Boyfriend rushed A.S.D. to the nearest hospital. V.Z. could tell that A.S.D.'s condition was deteriorating on the way to the hospital; A.S.D. became dehydrated and was sleepy.

A.S.D. was transferred to Dallas Children's Medical Center later that evening, and she had surgery in the early morning hours of July 12, 2009. Doctor Matthew Cox, board certified in child abuse pediatrics, testified that her injuries were among the most severe that he had seen a child endure. The first part of her small intestine "was torn completely apart," and she had a laceration to her pancreas, bruising to her right kidney, tearing of the mesentery (the fatty tissue through which the blood vessels supply blood to the bowels and the stomach), and a tear in the mezzo-colon. The doctor testified that in his opinion, the life-threatening, internal injuries were non-accidental and had to have been caused by someone intentionally. Cox testified that he would expect a child who had sustained such injuries to cry out or scream and to be in severe pain.

Dr. Cox also testified that based on the pathology findings and the description of the history of when her symptoms began, the injury occurred four to five days before A.S.D. was rushed to the hospital. He further testified that

V.Z. gave him no explanation for the external bruising. A.S.D. was removed from V.Z. on July 12, 2009.

The psychologist who evaluated V.Z. within months of A.S.D.'s removal diagnosed V.Z. with post traumatic stress disorder and major depressive disorder on Axis I and personality disorder NOS and mixed personality disorder with borderline paranoid features on Axis II. The psychologist also testified that V.Z. admitted that she had attempted suicide at the ages of fifteen and sixteen.

Boyfriend was the primary suspect in the criminal investigation of A.S.D.'s injuries from the first week following her hospitalization, and he eventually pled guilty pursuant to a plea bargain to reckless injury to a child on May 4, 2010, approximately two months before the termination trial. Included in his plea papers is a signed judicial confession. But even at trial, except for a temporary lapse based on her perception of Boyfriend's initial behavior at trial, V.Z. consistently maintained that she does not know what really happened to A.S.D. and that she is not sure that he caused A.S.D.'s injuries, offering explanations of possible accidents or other culprits, specifically, the couple's roommates at the time of the injury.

V.Z. continued to meet with Boyfriend after A.S.D.'s removal. V.Z. said that she did so to try to help the police locate him and because she wanted to know what had happened to A.S.D. We note that the record is void of any evidence that she tried to track down her former roommates for the police.

11

During this time, V.Z. became pregnant with Boyfriend's child. The two pushed and hit each other even after Boyfriend knew she was pregnant.

V.Z. continued to visit Boyfriend after he had gone to jail for injuring A.S.D.; V.Z. testified that she did this to try to find out what happened to A.S.D. and because his family would give her money. V.Z. visited Boyfriend in jail at least fifty times. V.Z. provided a written statement to Boyfriend's criminal defense counsel as well as medical research.

The trial court's unchallenged findings of fact include the following:

11. . . . . In December 2008, [V.Z.] met [Boyfriend] in person for the first time. She took [A.S.D.] and moved over a hundred miles away from the Palestine area to live with [Boyfriend]. [V.Z.] moved with [A.S.D.] to an area unknown to her and to which she did not have a support system to live with a person she had just met.

12. In 2008, [V.Z.] with [A.S.D.] lived in a shelter for abuse victims in the Palestine area. [V.Z.] was aware that she could return to the shelter.

13. In December 2008, [Boyfriend] called [V.Z.] a derogatory name, using the street vernacular for "prostitute", with the child present.

14. Prior to July 2009, [Boyfriend] pushed [V.Z.] during an argument while [A.S.D.] was in the home.

15. In April 2009, [V.Z.] engaged in shoplifting with [A.S.D.] in her care and was arrested for theft during the incident.

16. [V.Z.] allowed [A.S.D.] to stay with an acquaintance of [Boyfriend] for one week so that the acquaintance could experience what it was like to be a parent.

17. [A.S.D.] was brought to Denton Presbyterian Hospital on or about July 8, 2009. Bruises on the face and back were

12

observed on [A.S.D.] and [V.Z.] stated to staff that she did not know how they were caused.

18. [A.S.D.] was brought to Denton Regional Medical Center on or about July 11, 2009. While at the hospital, [V.Z.] was questioned about the bruises on [A.S.D.]'s face and back. [V.Z.] provided no explanation for the cause.

19. [A.S.D.] was transferred to Children's Medical Center, Dallas, on or about July 12, 2009 for severe, life-threatening abdominal injuries. The injuries included a transected small intestine, a laceration to her pancreas, and bruising to her kidney. The injuries were indicative of significant blunt force trauma to the abdomen.

20. While at Children's Medical Center, [V.Z.] was questioned by medical staff on more than one occasion about the bruises on [A.S.D.] and she had no explanation as to how they occurred. Initially, [V.Z.] did not provide an explanation for the cause of [A.S.D.]'s severe abdominal injuries.

21. [V.Z.] was informed by medical staff about the nature and severity of the child's injuries.

22. Danny Roberts, CPS investigator, responded to Children's Medical Center on July 12, 2009. He interviewed [V.Z.] [V.Z.] did not provide him with a plausible explanation for [A.S.D.]'s injuries. [V.Z.] was informed by Danny Roberts that her explanations for the child's abdominal injuries were not plausible and she understood that the injuries were nonaccidental. [V.Z.] acknowledged to Danny Roberts that if she did not injure [A.S.D.] that [Boyfriend] was the only other possible perpetrator.

23. [V.Z.] and [Boyfriend] were the only caregivers for [A.S.D.] in the days and week prior to the child's hospitalization. [V.Z.] and [Boyfriend] were the only plausible perpetrators of the abuse on [A.S.D.]

24. [V.Z.] admitted that [she] and [Boyfriend] were the only caregivers for [A.S.D.] in the days and week prior to the child's hospitalization.

. . . .

13

26. After removal of the child, [V.Z.] made contradictory statements that others were possible perpetrators of the abuse of [A.S.D.]

27. [V.Z.] was aware that law enforcement and CPS believed [Boyfriend] was responsible for [A.S.D.]'s injuries.

28. [V.Z.] continued to maintain contact with [Boyfriend] during the case, including traveling throughout the state to meet with him; having a sexual relationship with him[,] and visiting him in jail until mid-May 2010.

29. In November 2009, [Boyfriend] and [V.Z.] were involved in a physical altercation. [V.Z.] was aware that shelters were available to assist her and she did not take advantage of this resource.

30. [V.Z.] maintained during the majority of this case that [Boyfriend] was innocent of the allegations that he caused the injuries to [A.S.D.] [V.Z.] provided documents and statements to his criminal defense attorney in support of [Boyfriend]. [V.Z.] does not believe that [Boyfriend] caused the injuries to [A.S.D.]

31. [Boyfriend] pled guilty and was convicted of Injury to a Child of [A.S.D.]

32. [V.Z.] became pregnant after the removal of [A.S.D.] and gave birth to the child in May 2010.

. . . .

38. [V.Z.] had unstable housing during the case and stayed with individuals she had "just met[,]" endangering herself and her unborn child. [V.Z.] explicitly admitted to going home with strangers she met in a parking lot or at the jail while visiting [Boyfriend] in order to maintain a roof over her head.

. . . .

42. [V.Z.] has a history of endangering [A.S.D.]; has a history of unstable housing; and residing with individuals that she recently met.

14

The record contains evidence to support all of these unchallenged findings; accordingly, we are bound by them.[28] Consequently, reviewing the evidence in the light most favorable to the verdict, we hold that the evidence is legally sufficient to support the trial court's endangerment findings. Further, reviewing all the evidence and giving due deference to the trial court's findings, we hold that the evidence is factually sufficient to support the trial court's endangerment findings.

### D. Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest.[29] Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.[30] The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

---

[28]*See McGalliard*, 722 S.W.2d at 696; *Rischon Dev. Corp.*, 242 S.W.3d at 166.

[29]*In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[30]Tex. Fam. Code Ann. § 263.307(a) (West 2008).

15

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;

> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

> (C) guidance and supervision consistent with the child's safety;

> (D) a safe physical home environment;

> (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

> (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.[31]

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.[32]

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.[33] Furthermore, undisputed evidence of just one factor may be

---

[31]*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

[32]*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

[33]*C.H.*, 89 S.W.3d at 27.

sufficient in a particular case to support a finding that termination is in the best interest of the child.[34] On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[35]

In addition to the evidence and findings discussed above, the record contains the following evidence. The psychologist who diagnosed V.Z. with post traumatic stress disorder and major depressive disorder on Axis I and to whom V.Z. admitted two prior suicide attempts recommended a psychiatric referral and compliance with any psychiatric recommendations, counseling, and parent education classes. The psychologist testified that without ongoing treatment or progress made in treatment, it would be difficult for V.Z. to place A.S.D.'s best interest ahead of her own needs and feelings. In early 2010, several months after getting the psychological evaluation, V.Z. finally saw a psychiatrist. V.Z. admitted at trial that the psychiatrist had recommended medication but that she refused to take it and that she had not seen the psychiatrist since April 2010.

But V.Z. did receive extensive counseling from a licensed clinical social worker, participating in twenty-eight sessions instead of the standard twelve for a CPS client, and completed parent education classes. V.Z.'s counselor opined that V.Z.'s depression improved through counseling. Yet when asked what else (besides motivation and willingness) V.Z. would need to become a good mother,

---

[34]*Id.*

[35]*Id.*

her counselor testified, "She needs stability, housing, a job, [to] be able to protect the children, [to use] good judgment of course around the children. We haven't seen that, yet, unfortunately."

By V.Z.'s own account, she and A.S.D. moved at least seven times before A.S.D.'s removal. After the removal, V.Z. moved at least fourteen more times, sometimes moving in with complete strangers, including two people she met while visiting Boyfriend in jail and one person she met in a parking lot. A few days before trial, she secured an apartment, thanks to people from her church paying the first two months' rent. But she still had no job and no work permit.

In addition to the evidence of V.Z.'s protective actions concerning Boyfriend, the letter that she wrote his criminal defense counsel discusses her desire to marry him and raise a family with him. This fact becomes especially significant, given her prolonged denial of or ambivalence about his responsibility for A.S.D.'s injuries and the facts that they already share a child and that his sentence for reckless bodily injury was for only two years' confinement and began over a year ago.

Upon her release from the hospital, A.S.D. was placed with foster parents in a stable home. She has no remaining medical needs related to her injury and is doing well in her foster home. A.S.D. and the foster parents have bonded, and the foster parents would like to adopt her if her birth parents' rights are terminated.

In addition to the findings provided above, the trial court also entered the following unchallenged findings of fact, all of which are supported by the evidence:

25. An adversary hearing was held on July 24, 2009. [V.Z.] appeared in person and waived counsel and agreed to the entry of the temporary orders.

. . . .

33. On July 24, 2009, the Court entered temporary orders that specifically established the actions necessary for [V.Z.] to obtain the return of [A.S.D.]

34. On July 24, 2009, [V.Z.] was ordered by the Court to participate in the following services: a psychological evaluation and follow the recommendations of the psychological evaluation; participate in individual counseling and follow any and all recommendations and continue until no further sessions are necessary; participate in parenting classes until completion; and submit to drug testing at the request of [the Texas Department of Family and Protective Services (TDFPS)].

35. [V.Z.'s] psychological evaluation recommended that she comply with a psychiatric evaluation and follow the recommendations. [V.Z.] did not follow the recommendations of the psychiatric evaluation.

36. [V.Z.] was court ordered to establish and maintain safe and suitable housing and refrain from engaging in criminal activity. [V.Z.] was court ordered to establish and maintain suitable employment for a period of at least six months and continue through the pendency of the suit.

37. During the case, Children's Medical Center staff, [TDFPS] staff, and CASA advocates referred [V.Z.] to shelters to assist her with housing.

. . . .

39.     [V.Z.] has been employed and had employment available to her during periods of her life.  [V.Z.] had employment available to her during this case.   [V.Z.] did not maintain suitable employment for a period of six months during this case.  While being physically capable of being employed [V.Z.] instead relies on the charity of strangers or relatives of her imprisoned boyfriend for support.

40.     [TDFPS] made reasonable efforts to return [A.S.D.] to [V.Z.] by offering her services; supporting her in working her services; support with her immigration status; and support in referring her to community resources.

41.     CASA supported [V.Z.] by supporting her in working her services; support with her immigration status; and support in referring her to community resources.

. . . .

43.     [V.Z.] has inadequate plans to parent [A.S.D.]  [V.Z.] does not have an adequate social support system to aid her in the care of [A.S.D.]

44.     The Court explicitly finds that at the present time [V.Z.] does not have the means to support and care for herself, and therefore, does not have the means to support and care for a young child.

. . . .

57.     [TDFPS]'s plan for [A.S.D.] is adoption by foster parents who have cared for the child since July 2009.  The Foster Parents have met the needs of [A.S.D.] while she has been placed in their home.  The Foster Parents can provide a safe and stable environment for the child.   The foster parents have an adequate support system.

Applying the appropriate standard of review, we hold that the evidence is factually sufficient to support the best interest finding.  Having held that the trial court's endangerment findings are supported by legally and factually sufficient

evidence and that the best interest finding is supported by factually sufficient evidence, we overrule V.Z.'s first two issues.

Because a best interest finding and a finding of only one ground alleged under section 161.001(1) are sufficient to support a judgment of termination,[36] we do not reach V.Z.'s fourth issue, which challenges the finding under subsection (O).[37]

## II. No Abuse of Discretion to Deny Extension of Dismissal Deadline

In her third issue, V.Z. complains that the trial court abused its discretion by not extending the case by 180 days because she needed more time to obtain a work permit. On April 20 and June 18, 2010, V.Z. filed motions to extend the dismissal date by 180 days, but there is no mention of problems with her immigration status in those motions. We review a trial court's determination on a motion for extension for an abuse of discretion.[38] Section 263.401 of the family code provides,

> (a) Unless the court has commenced the trial on the merits or granted an extension under Subsection (b), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child

---

[36]*In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

[37]*See* Tex. R. App. P. 47.1.

[38]*In re D.W.,* 249 S.W.3d 625, 647 (Tex. App.—Fort Worth), *pet. denied,* 260 S.W.3d 462 (Tex. 2008).

relationship or requests that the department be named conservator of the child.

(b) Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child. If the court makes those findings, the court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a).[39]

On June 18, 2010, twelve days before trial began and almost a year after the trial court ordered that V.Z. obtain stable housing and stable employment for at least six months, the trial court conducted a hearing on the motion filed June 18, 2010. V.Z. testified that she requested an extension because it had been difficult to find work during her pregnancy and because she had not yet obtained a work permit. She stated that she had an upcoming appointment for the necessary fingerprinting and picture-taking on June 29, 2010. She testified unequivocally that after June 29, 2010, she would be able to be legally employed in the United States. On cross-examination, she acknowledged that it was not certain that she would be able to work legally by that date because another process would also have to be completed before she could work legally in the country. No evidence was offered or admitted to demonstrate why the fingerprinting and picture-taking had not already taken place.

---

[39]Tex. Fam. Code Ann. § 263.401 (West 2008).

23

V.Z. acknowledged that it was possible that her baby born May 24, 2010, was conceived in August 2009, after A.S.D.'s removal, and she admitted that Boyfriend fathered that baby. She testified that she did not know that Boyfriend had pled guilty to injuring A.S.D. and did not know if she believed that he was guilty. She admitted to visiting Boyfriend in jail and updating him on the pregnancy. She also admitted to missing visits with A.S.D. and counseling sessions because of transportation issues, living in several different places while the case was pending, and a several-month gap in counseling.

V.Z. argued that her recent pregnancy and her immigration status were extraordinary circumstances. TDFPS and A.S.D.'s ad litem opposed extending the case. The trial court denied the motion.

Given the evidence presented in the hearing, especially that indicating a failure to protect, we cannot say that the trial court abused its discretion by failing to find that extraordinary circumstances justified a 180–day extension of the dismissal deadline.[40] We overrule V.Z.'s third issue.

---

[40] *See In re D.K.*, No. 02-09-00117-CV, 2009 WL 5227514, at *2 (Tex. App.—Fort Worth Dec. 31, 2009, no pet.) (mem. op.) (holding that trial court's determination that mother who had failed to visit children during pendency of case failed to present extraordinary circumstance was not abuse of discretion); *In re L.D.K.,* No. 02-07-00288-CV, 2008 WL 2930570, at *3 (Tex. App.—Fort Worth July 31, 2008, no pet.) (mem. op.) (holding father who argued service plan was deficient because of misnomer despite evidence that he knew what was expected of him failed to present any extraordinary circumstances that would necessitate an extension); *Shaw v. Tex. Dep't of Family & Protective Servs.,* No. 03-05-00682-CV, 2006 WL 2504460, at *8 (Tex. App.—Austin Aug. 31, 2006, pet. denied) (mem. op.) (holding mother did not show that needing more time

24

## III. Constitutional Issues Waived

In her fifth issue, V.Z. complains that she was deprived of due process guaranteed by the Fourteenth Amendment of the United States Constitution. In her sixth issue, V.Z. complains that she was deprived of due course of law guaranteed by section 19 of Article I of the Texas Constitution. In her seventh issue, she complains that she was deprived of equal protection guaranteed by both constitutions. To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion.[41] If a party fails to do this, error is not preserved, and the complaint is waived.[42] The objecting party must get a ruling from the trial court.[43] This ruling can be either express or implied.[44]

Because V.Z. failed to raise these constitutional complaints below, she has failed to preserve them for appeal. We therefore overrule V.Z.'s fifth, sixth, and seventh issues.

---

after failing to make progress on the service plan for eight months amounted to extraordinary circumstances).

[41]Tex. R. App. P. 33.1(a); *see also* Tex. R. Evid. 103(a)(1).

[42]*Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

[43]Tex. R. App. P. 33.1(a)(2), (b).

[44]*Id.*; *Frazier v. Yu*, 987 S.W.2d 607, 610 (Tex. App.—Fort Worth 1999, pet. denied).

## IV. Conclusion

Having overruled V.Z.'s dispositive issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT, J.; and WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment).

DELIVERED: November 17, 2011